UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PATRICIA O'HARA,

                          Plaintiff,

                                                        <u>DECISION AND ORDER</u>

                                                        08-CV-6121L

          v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

                          Defendant.
_____

      Plaintiff Patricia O'Hara ("O'Hara") filed this action against National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), seeking benefits pursuant to a National Union disability plan (the "Plan") offered by her former employer, ITT Flygt Corporation ("ITT"), in which O'Hara was a participant, and for which National Union acted as the Plan administrator. O'Hara alleges that National Union's decision to deny her disability benefits under the Plan was unsupported by sufficient evidence, inconsistent with the terms of the Plan, and in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1).

      National Union now moves for summary judgment (Dkt. #12), arguing that O'Hara has failed to demonstrate that its determination was unsupported by sufficient evidence, and/or inconsistent with the terms of the Plan. For the reasons set forth below, that motion is granted.

I.  **Standard of Review.**

Where, as here, an ERISA plan does not give the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the Plan (Dkt. #12-3, Exh. A), the Court's review of the denial is made under a de novo standard. Applying that standard, the Court will review "all aspects of [the] administrator's eligibility determination, including fact issues, de novo." *Troy v. Unum Life Ins. Co. of Am.*, 2006 U.S. Dist. LEXIS 14965 at *22 (S.D.N.Y. 2006), *citing Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 293 (2d Cir. 2004). *See also Sharkey v. Ultramar Energy*, 70 F.3d 226, 230 (2d Cir. 1995); *Heidgerd v. Olin Corp.*, 906 F.2d 903, 909 (2d. Cir. 1990).

The existence of conflicting evidence, even a conflicting opinion from a claimant's treating physician, is not dispositive of the matter. Courts undertaking the de novo review of an administrator's decision "continue[] to possess the authority to weigh competing physician opinions [themselves], and to make findings of fact based on [their] own consideration of the evidence." *Troy*, 2006 U.S. Dist. LEXIS 14965 at *24.

II. **Plaintiff's Claims.**

   A.  **O'Hara's Employment and Medical History**

The Plan provides for disability coverage where, "as a result of injury and commencing within one year of the date of the accident an insured person is totally and permanently disabled and prevented from engaging in each and every occupation or employment for compensation or profit for which he is reasonably qualified by reason of his education, training or experience." (Dkt. #12-3, Exh. A at D00005). Written notice of disability claims must be provided to the employer within

twenty days after the occurrence or commencement of the covered loss, or as soon thereafter as is reasonably possible. (Dkt. #12-3, Exh. A at D00009).

O'Hara was a Plan participant during her employment with ITT, from 1993 through August 2002. On March 15, 2001, while working as an office administrator in the Rochester, New York office of ITT, O'Hara slipped and fell, striking her head on the floor and sustaining a concussion. O'Hara was taken to the emergency room, where she was x-rayed and treated for headaches. O'Hara continued to work at ITT, and in or about July 2001, O'Hara's manager began to receive complaints from O'Hara's coworkers, alleging that O'Hara behaved unprofessionally and had difficulty maintaining satisfactory working relationships with colleagues. O'Hara's supervisor discussed the matter with her and changed her work assignment, but O'Hara's interpersonal relationships at ITT continued to deteriorate. On June 6, 2002, O'Hara's employment with ITT was terminated, on the grounds of interpersonal difficulties.

From the time of her fall onward, O'Hara was treated by neurologist Dr. Joseph Mann for headaches, and associated decreases in executive function, mood changes, and a sleep disorder. On July 10, 2002, Dr. Mann completed a report for O'Hara's use in seeking workers' compensation benefits, which stated simply that O'Hara was "completely disabled as of June 10, 2002 and unable to work at this time." (Dkt. #12-4, Exh. E at D00491). On December 12, 2002, Dr. Mann again stated that O'Hara was "totally disabled for the type of work that she was doing [as an administrative assistant at ITT], having suffered a head injury at work." (Dkt. #12-4, Exh. E at D00486). In June 2002, O'Hara began treating with Dr. Jaimala Thanik, a pain management specialist. In April 2003, Dr. Thanik concluded that although O'Hara had some functional limitations, she "may try going back

to work doing half days with restrictions of no repetitive type work." (Dkt. #12-4, Exh. F at D00420).

On January 29, 2004, O'Hara submitted a claim for disability benefits under the Plan. The claim was processed by AIG Domestic Claims, Inc. ("AIG"), which reviewed O'Hara's medical records. AIG also reviewed medical examination reports from independent medical examiners Dr. Guy Corkhill, Dr. Thomas Letourneau, and Dr. David Marzulo. Dr. Corkhill, a neurosurgeon who examined O'Hara on multiple occasions beginning September 9, 2002, concluded on July 7, 2003 that O'Hara had a "mild partial temporary" disability arising from the accident. (Dkt. #12-5, Exh. G at D00334). Dr. Letourneau, a neurologist who examined O'Hara on March 24, 2003, indicated that although O'Hara was suffering from mild/moderate depression stemming from chronic pain, "[t]here is no psychiatric disability . . . [f]rom a psychiatric standpoint, [O'Hara] is able to return to work full-time." (Dkt. #12-5, Exh. H at D00315). Neurologist Dr. Marzulo, who examined O'Hara on September 12, 2005, felt that she was unable to perform her pre-injury occupation or work in a busy office setting requiring speedy recall and verbal skills, but nonetheless had only a "partial disability" and could perform a "low emotional stress job duty which would not necessitate a multitude of recall actions or marked responsibility . . . on a part time basis[,] up to 20 hours per week initially as a so-called testing ground." (Dkt. #12-5, Exh. I at D00106).

After reviewing the record, AIG denied O'Hara's claim for benefits on January 6, 2006, on the grounds that "while there is proof that [O'Hara was] disabled from [her] own job, there is [a] lack of objective medical evidence showing [disability] from any employment . . . neither proof of a generalized inability to work nor have any of [her] doctors actually opined that [her] disability is

permanent, as required by the policy." (Dkt. #12-5, Exh. J at D00089). O'Hara appealed, and submitted additional medical evidence, including a June 28, 2006 letter from Dr. Mann, which employed the precise language of the Plan and stated that O'Hara was "totally disabled and prevented from engaging in each and every occupation or employment for compensation or profit that she was reasonably qualified for within 1 year of the March 15, 2001 fall." (Dkt. #12-5, Exh. M). On November 13, 2006, the ERISA Appeal Committee concluded that there was insufficient medical evidence in the record to support Dr. Mann's June 28, 2006 letter, and otherwise echoed AIG's initial findings, upholding the denial of O'Hara's claim for benefits. (Dkt. #12-5, Exh. N).

**B.     National Union's Motion for Summary Judgment**

**1.     National Union's Waiver of Timeliness Defense**

Initially, National Union contends that O'Hara's claim for benefits is untimely, because she failed to provide a written notice of claim within twenty days after "commencement of the loss." Because the latest possible date upon which a loss could have arisen under the Policy's one year time limit is March 15, 2002 – one year after the date of O'Hara's fall – National Union maintains that O'Hara was required by have submitted her notice of claim within twenty days thereafter. It is undisputed that O'Hara did not file a notice of claim until January 29, 2004 – nearly three years after her fall, and nearly two years after a disability for which coverage was provided could possibly have arisen.

It is well settled under New York insurance law that, "an insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, and where

the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense." *New York v. Amro Realty Corp.*, 936 F.2d 1420, 1431 (2d Cir. 1991). The Second Circuit has held that the doctrine of waiver may be applied to ERISA claims in some instances. *See Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 381 (2d Cir. 2002). However, "there is no bright-line rule for determining whether waiver applies in a particular case and a case-specific analysis is required." *Shutts v. First Unum Life Ins. Co. of Am.*, 310 F. Supp. 2d 489, 494 (N.D.N.Y. 2004), *citing Lauder*, 284 F.3d 375 at 382. In performing the case-by-case analysis, the Court must determine whether timely notice is a required element of the policy, because "a claim of waiver [can]not be used to expand the policy" to extend coverage beyond the bargained-for extent. *Lauder*, 284 F.3d 375 at 381. However, if waiver would not extend the bargained-for coverage, the court must determine whether the insurer intended to waive coverage, and possessed sufficient knowledge of the circumstances surrounding the relevant defense. *Id.*, 284 F.3d 375 at 382.

Here, the Plan defines the period for timely notice as, "within twenty days after the occurrence or commencement of any loss covered by this policy, *or as soon thereafter as is reasonably possible*." (Dkt. #12-3, Exh. A at D00009) (emphasis added). I find that the inclusion of the phrase, "as soon as is reasonably possible," creates an exception to the twenty-day time limit and indicates that a later notice of claim would not expand the benefits of the policy. *See e.g.*, *Shutts*, 310 F.2d 489 at 494-495 (phrase "as soon as is reasonably possible" creates an exception for those who cannot file a proof of claim within the designated number of days, and thus failure to timely file proof of loss does not expand the policy and may be waived).

Turning to the second consideration, I note that National Union's letter denying coverage, as well as the letter denying O'Hara's appeal, purport to list the reasons why coverage was denied. Although it was plain on the face of O'Hara's claim that her alleged disability related to an accident that had occurred some four years prior, National Union never objected to the timeliness of O'Hara's claim, or suggested anywhere that her notice of claim had not been filed "as soon as [was] reasonably possible" in light of the nature and progression of O'Hara's disability. I therefore find that National Union's failure to raise O'Hara's allegedly untimely notice of claim as a defense, despite having all of the relevant facts before it and ample opportunities to assert it and allow O'Hara the chance to prove that her notice of claim had been filed "as soon as is reasonably possible," did operate as a knowing waiver of that defense.

### 2. National Union's Finding that O'Hara Was Not Disabled

Upon review of the entire record, I find that the denial of O'Hara's application for disability benefits was based on sufficient evidence, because there is no credible proof that O'Hara suffered from a permanent and total disability which "commenc[ed] within one year of the date of the accident." (Dkt. #12-3, Exh. A at D00005).

Generally, an employee who continues to report to work, as O'Hara did for more than a year following her accident, cannot be found to have been simultaneously "disabled" under the terms of an ERISA plan which defines disability includes the inability to work. *See* e.g*., Kunstenaar v. Conn. Gen. Life Ins. Co.*, 902 F.2d 181 (2d Cir. 1990); *Zimmer v. Reliance Standard Life Ins. Co.*, 1998 U.S. Dist. LEXIS 15060 (S.D.N.Y. 1998), *aff'd*, 2000 U.S. App. LEXIS 6215 (2000).

O'Hara contends, however, that the fact that she returned to her position with ITT and continued to work for approximately fifteen months following the accident does not indicate that she was not disabled, because during this time, certain mental and behavioral problems which stemmed from the fall were steadily becoming more pronounced, albeit in such a subtle way that O'Hara and her treating neurologist were unable to recognize that they had reached a disabling intensity. O'Hara suggests that it is precisely these mental and behavioral issues which precipitated her termination. Indeed, at O'Hara's initial visit with Dr. Mann on October 8, 2001, Dr. Mann diagnosed O'Hara with "posttraumatic headache disorder associated with problems with executive function, mood and sleep." (Dkt. #12-4, Exh. E at D00497).[1] IME Dr. Corkhill also noted that, "claimant states that she had nine years of good periodic reviews but was terminated . . . due to stated substandard interaction with employees and deteriorating level of work. Loss of executive skills is a common aspect of mild head injury syndrome [with which O'Hara was diagnosed]." (Dkt. #12-5, Exh. G at D00259).

I concur with O'Hara that there is substantial evidence that her termination from ITT was caused in significant part by the onset and intensification of impaired executive functions stemming from her fall, and that this impairment caused her to be disabled from her job as an administrative assistant at ITT on or before March 15, 2002. Although O'Hara's termination may not have occurred until June 6, 2002 and she continued to report to work up until that time, the record demonstrates

---

[1] "Executive function" has been defined as: "a set of cognitive abilities that control and regulate other abilities and behaviors . . . Executive functions are important for successful adaptation and performance in rel-life situations . . . In this way, executive function contributes to success in work and school and allows people to manage the stresses of daily life. Executive functions also enable people to inhibit inappropriate behavior. People with poor executive functions often have problems interacting with other people since they may say or do things that are bizarre or offensive to others." Barry, Danielle, *Executive Function*, GALE ENCYCLOPEDIA OF MENTAL DISORDERS (2003).

that she was not able to perform the requirements of her position for a full year following the accident. Her cognitive and behavioral symptoms became noticeable, and began to significantly hamper her job performance, on or before July 9, 2001, when ITT counseled O'Hara about impolite and unprofessional behavior toward coworkers which had been "occurring earlier in the year." (Dkt. #12-4, D00175). By September 2001, O'Hara's inappropriate social interactions had reached the point where her supervisor warned her that her continued employment was in jeopardy. *Id*. The fact that O'Hara, who had previously enjoyed a satisfactory record of performance for approximately seven years prior to her accident, suddenly required counseling and was threatened with imminent termination because of a marked inability to get along with her own coworkers, suggests that her deficiencies in or before July 2001, and continuing thereafter, were both pronounced and significant. Indeed, National Union stated to O'Hara, both in response to her initial application for disability benefits and on appeal, that "there is proof [in the record] that you are disabled from your own job." (Dkt. #12-5, Exh. J at D00089, Exh. N at D00075).

Nonetheless, while I find that there is sufficient evidence indicating that O'Hara did become disabled from her position as an administrative assistant for ITT within one year of her accident due to decreases in executive function which were noted and attributed to the accident by her treating neurologist, Dr. Mann, and IME Dr. Corkhill, I concur with National Union's conclusion that there is a lack of sufficient evidence that O'Hara was disabled from "each and every occupation . . . for which [she was] reasonably qualified" on or before March 15, 2002. (Dkt. #12-3, Exh. A at D00005).

In referring to disability from "each and every occupation" for which she was qualified, the Court notes the import of the Second Circuit's holding in *Demirovic v. Building Service 32 B-J Pension Fund,* 467 F.3d 208 (2d Cir. 2006). In that case, which was decided after National Union's initial denial of benefits to O'Hara but just prior to its denial of her appeal, the Second Circuit found that where an ERISA disability plan's language defines disability as the inability to engage in *any* gainful employment, such language cannot be interpreted "so strictly as to deny benefits to any claimant who is physically capable, in the abstract, of any kind of work whatsoever, regardless of the claimant's individual vocational circumstances." *Demirovic*, 467 F.3d 208 at 213. Rather, in order to meet the standard of total disability, the claimant is only required to show the "inability to follow any occupation from which he could earn a *reasonably substantial income rising to the dignity of an income or livelihood*, even though the income is not as much as he earned before the disability." *Id*., 467 F.3d 208 at 214 (emphasis added). In response to such evidence, "a proper inquiry [by the plan administrator] would require not only a medical assessment of [a claimant's physical and mental capacities], but also a non-medical assessment as to whether she has the vocational capacity to perform any type of work – of a type that actually exists in the national economy – that permits her to earn a reasonably substantial income from her employment, rising to the dignity of an income or livelihood." *Id*., 467 F.3d 208 at 215.

Here, O'Hara presented no credible evidence that she was unable "to follow any occupation from which [she] could earn a reasonably substantial income rising to the dignity of an income or livelihood." *Id*., 467 F.3d 208 at 214. There are no records, medical or otherwise, which suggest that O'Hara suffered from any severe, generalized or total disability on or before March 15, 2002.

To the extent that O'Hara purports to rely on Dr. Mann's June 28, 2006 letter opining that O'Hara became totally disabled in the year following her accident, I find that this letter, which contains no analysis whatsoever, is unsupported by any medical or other evidence, and in fact, is contradicted by other medical evidence in the record. For example, on July 10, 2002, four days after O'Hara's employment was terminated, Dr. Mann wrote a cursory letter opining that O'Hara had been totally disabled for a mere four weeks – as of June 10, 2002. (Dkt. #12-4, Exh. E at D00491). Moreover, O'Hara's treating pain management specialist, Dr. Thanik, as well as IMEs Dr. Corkhill, Dr. Letourneau, and Dr. Marzulo, each opined that O'Hara was capable of part or even full-time work, with minor physical restrictions, and limited to low stress work and the avoidance of repetitive tasks.

The ERISA Committee's consideration of O'Hara's appeal, which took place just two weeks after the Second Circuit's decision in *Demirovic* was issued, would ideally have included a more comprehensive consideration of O'Hara's vocational capacity, including but not limited to a transferable skills analysis, consideration of Medical Vocational-Guidelines, or testimony from a rehabilitation consultant or vocational expert. *See Demirovic*, 467 F.3d 208 at 215, 216 (suggesting a non-exhaustive list of various ways in which plan administrators might assess a claimant's vocational capacity). However, "[w]here, as here, the plan is silent on the issue of non-medical vocational characteristics, the nature of this consideration [of vocational capacity] will be within the plan administrators' broad discretion." *Demirovic*, 467 F.3d 208 at 215. Although there is no evidence that National Union performed a comprehensive vocational analysis, its denial of coverage was grounded firmly upon the record before it, including the opinions of O'Hara's treating and examining physicians. Each of those opinions was rendered with knowledge of O'Hara's previous

- 11 -

position and duties, and descriptions of her functional capacity as it related to her ability to perform work. 467 F.3d 208. *See generally* Dkt. #12-5 at Exh. G (IME Dr. Corkhill on 9/9/02: "[t]his [claimant] was involved at work on 3/15/01 while working as an office administrator . . . "; Dr. Corkhill on 1/6/03: "Light Duty Restrictions: Claimant should lift no greater than 30 lbs. And avoid bending, stopping, twisting and reaching overhead"; Dr. Corkhill on 7/7/03: "Mild temporary and partial" disability); Dkt. #12-5 at Exh. H (IME Dr. Letourneau on 3/24/03: "[claimant] has been out of work since June 2002 from her job as an office administrator at ITT-Flygt"); Dkt. #12-5 at Exh I (IME Dr. Marzulo on 9/13/05: "[claimant] was working for ITT Flyt [sic] as an office administrator . . . she performs such duties as typing, fling, working phones, and generally clerical work . . . I cannot state that Ms. O'Hara was totally, continuously, and permanently disabled from any occupation for 12 consecutive months from the date of her 3/15/01 injuries as she reportedly by her own admission worked for at least a year following the date of the accident and was able to perform at least portions of her duties at that time . . . conditions effecting [sic] her ability to return to work include cognitive complaints primarily memory impairment and persistent pain the form of a headache . . . [a] low emotional stress job duty which would not necessitate a multitude of recall actions or marked responsibility on the part of the claimant I feel could be initiated on a part time basis . . . as a so-called testing ground").

Moreover, O'Hara's sole response to National Union's invitation to "provide documentation . . . . that you were totally disabled and prevented from engaging in each and every occupation" was Dr. Mann's June 28, 2006 letter, which provides no explanation of O'Hara's vocational abilities or limitations. In an ERISA action, the claimant bears the ultimate burden of demonstrating his

entitlement to benefits. *See Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006) (a plaintiff challenging the denial of benefits under ERISA bears "the burden of proving by a preponderance of the evidence that he is totally disabled within the meaning of the plan"). Under the circumstances, I find that there is no basis to "allocate the entire burden to defendants" to demonstrate that O'Hara was *not* disabled from all work susceptible of earning a reasonably substantial income, when O'Hara has produced no evidence that she *was* suffering from a general, permanent disability which prevented her from earning a reasonable income. *Giraldo v. Bldg. Serv. 32B-J Pension Fund*, 2008 U.S. Dist. LEXIS 108329 at *17 (S.D.N.Y. 2008) (upholding denial of disability benefits notwithstanding plan administrators' failure to perform a comprehensive vocational review, where plaintiff's physicians rendered opinions concerning her vocational capacity, and plaintiff refused to provide additional evidence of functional capacity); (Dkt. #12-5, Exhs. L, M). I therefore find that there is insufficient evidence in the record that O'Hara was unable to perform any jobs for which she was qualified, within the meaning of *Demirovic*, despite a full and fair opportunity for O'Hara to produce such evidence. 467 F.3d 208 at 211-215.

Finally, while it is undisputed that O'Hara was ultimately awarded Social Security disability benefits and/or Workers' Compensation benefits, that fact does not compel a conclusion that National Union's denial of benefits was unsupported by the evidence before it. It is well-settled that a conclusion of the SSA that a claimant is disabled is not binding upon a plan administrator, and there is no suggestion that the SSA or Workers' Compensation Board evaluated O'Hara's disability claims using definitions and procedures consistent with those of the Plan. *See e.g., Fortune v. Group Long Term Disability Plan*, 637 F. Supp. 2d 132, 144 (E.D.N.Y. 2009).

In sum, I find that, based upon the record before me, including O'Hara's medical records and employment history, National Union's determination that O'Hara was not disabled as defined by the Policy was correct.

## Conclusion

For the foregoing reasons, I find that National Union's determination that O'Hara was not disabled within the meaning of the Plan was correct, and is supported by sufficient evidence of record. National Union's motion for summary judgment (Dkt. #12) is therefore granted, and the Complaint is dismissed, with prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      March 23, 2010.